Your Honors, the third case of the morning call is 213-0367, William Sushi, as Independent Administrator of the Estate of Randy Sushi v. City of Geneva and the Geneva Park District. On behalf of the Appellant, Mr. David C. Wise. On behalf of the City of Geneva, Ms. Amanda Hillman. On behalf of the Geneva Park District, Mr. Edward Dutton. Ms. Hillman is going to take the first five as Appellate and Mr. Dutton is going to take the next ten. Mr. Justice, this is the Court. David, Counsel. I had the fortune of going first and last in the Appellate Briefs, so I think my position might be out there. But having said that, I set out in my Appellate Briefs what I thought would be a logical way to approach the issues the Court has, and I think it may be different from the way the defendants are approaching some of the facts, some of the legal issues. But it made sense to me, and if you disagree, I'd be happy to address it in the way that you choose, but to go open and obvious that analysis first. Then, whether that's a question of law or if it's fully developed enough to be a question of fact, if it were to be concluded by the Court that it's a question of law, but I'd argue an alternative, then whether or not the deliberate encounter exception applies to that duty question. And then third, getting past those two, then we would get, I think, to the 3-1-10 analysis, because it seems to me that we would analyze this kind of under a common law theory if there's a duty at all. Then if there's a duty, then we turn to the tort immunity act to see if it's abrogated by that statute. My reading of the case law certainly comports with what counsel for the defense says in the sense that most of the cases that hit the appellate courts or the Supreme Court when it comes to water find it to be an open and obvious situation. I did think, though, that the Ward case, not the Kmart Ward, but the Ward with the waterway, when it analyzed the question of the turbulent water downstream of an artificial change in a riverway, and said that the factors there had to be analyzed under traditional duty analysis, not simply water, open and obvious, and given that that Ward case followed Lerma, which was then followed by Jackson, it seemed to me that the Ward matter put a finer point on the question of open and obvious as it relates to man-made conditions in water. And that is the reason why that was part of my argument, which, albeit unsuccessful in the trial court, the argument about why this water at this stage is not definitively open and obvious, at least the hazards of the aerated water downstream of the dam at issue in this case. Now, counsel, did you plead that the danger was not apparent? And if not, did you have to do that? I think I did plead that it was not known to the people who would... From the surface? Let me answer your question, both of them. One, I do believe I pleaded that. And certainly that was argued by all of us in the trial court. Second, I don't think I have to plead, articulate this properly. In this case, it's gotten us further down the road than usual. Usually there's a summary judgment nature where these facts are learned through depositions. We know everybody's going to say exactly what some of the specifics are. But I believe that my pleading requirement is to plead a cause of action. Then what the defense did is they filed this 619 motion, an affirmative matter, which defeats my cause of action. So I don't know if I have to plead that it was hidden. I think I did plead it. But even though we're past that now, and I actually recall in part of the discussion in the trial court that I didn't plead the deliberate encounter exception to the open and obvious defense to the case. I don't think that I have to plead that far down, which does beg the question of when we're doing a 619 type of motion to dismiss. Some of the 619s are very clear. The facts are, you know, cause of action, date of occurrence, did you blow a statute of limitations. Some of them, however, seem to have a lot more facts involved. And this one in particular, as the Ward case suggests, the Ward came to the court, I think on summary judgment, after we learned where exactly does this undertow get to the kids in this particular case. How far out does it go? What warnings were out there and present? What would a person know or not know? But I didn't, I believe my pleadings sufficiently state that it's a hidden danger, unknown, this aerated water which is under the, which actually the aerated water, the nature of it, is something that makes the water less buoyant than normal water. And a human being while in what appears to be water, it's actually not water that you can swim in. You'll sink because our body is too heavy to be buoyant in this aerated water. That's the hidden danger downstream of these dams. So I can speak more to that. Or the question then I think, though, is the way I read Ward, the duty analysis, which I suspect you, your Justices, you can undertake here, but I don't think it was undertaken by the trial court. The Ward duty analysis with those three factors, the likelihood of risk, the foreseeability, the magnitude, it was just this is water, it's open and obvious, that's the end of the discussion, which I think Ward says is not any longer the way to do it, depending on the nature of the hazard in the water. Now, does it make a difference that in Ward the defendants own the body of water that we're talking about? In Ward they did own it, and I think they even created it. And I realize that is a distinction. Now, I think it doesn't matter to the question of open and obvious. It would go a different direction. It would have had different implications on control and things like that. But if we're really talking about open and obvious, who created this hazard I don't think is material. So that's my thought on that. So I think in some cases when we have a duty question, there are mixed questions of law and fact in order to get to the question of whether there is or isn't a duty. And I think that perhaps the trial court felt that given that it's water, it's open and obvious, and I don't think that was the right way to go. Moving on, if you would like me to, the issue then arose of, let's assume for discussion's sake, that it was open and obvious as a matter of law, which I don't assume, but if we do that. The question then is this deliberate encounter argument. And a lot was made in the trial court that Randy Succi knew that there was a hazard there, and there's certainly no question about that. I mean, I know that he knows there's a risk. The children appear to be drowning in the water. What risk, though, Randy Succi, again, I don't think he would know about the nature of this unusual water, this aerated water downstream of the dam, but that's actually a material to the deliberate encounter exception, which is did the person have some reason why they were going and deliberately encountered this danger. So I think foremost, his knowledge of what danger was there versus what was actually there, that's not a law question for us. It's not a law question. It's a fact question. But then the deliberate encounter question, and counsel raised this in their appellate response brief and in arguments in the trial court that there has to be an economic compulsion component in order to trigger the deliberate encounter exception to the open and obvious. And they cite Salome, and a lot of cases do talk about that. And, in fact, if memory serves, the jury instructions speak to this economic compulsion. But the purpose of having that issue, this economic compulsion issue, the purpose isn't to limit cases and the application of that doctrine to economic compulsion situations. Rather, the reason is because I think it seems counterintuitive that people would deliberately encounter danger simply for money. And yet we find in workplace situations oftentimes workers are put in spots, and the response is he had to encounter that. And the response used to be you can't use the deliberate encounter exception because it's only an economic compulsion. And yet the Illinois law has found, no, that is a good reason for economic compulsion. And when we look at the Salome case, it actually says we, the court, don't limit the deliberate encounter exception to economic compulsion cases, even though most of them are. And that's just most of the matters that have come to the appellate courts. And there were a few they cited that were not economic compulsion, ones in trampoline and so forth. But they said they didn't find any deliberate encounter in that case because they found why would a person encounter that danger. Whereas here what my point was is it's not economic compulsion. I don't believe that's a requirement of condition proceeding to the application of that doctrine. I don't believe any court has said that. I think they just left it open and have applied it in non-economic cases. And I think looking at what we know about what happened, I think that Mr. Succi's activity would be something that a reasonable person, a jury, would look at this. And it's usually a fact question, deliberate encounter. Was the compulsion that the actor acted under, the circumstances, something that a reasonable person would expect someone to do? And I think that the way I put it is, is it reasonably foreseeable that someone would jump into water to save children who were drowned? I think that would be yes. I think that's a fact question, but I think that the answer would be yes. And then the deliberate encounter exception could be triggered if the jury found it, could be triggered to defeat the open and obvious argument by the defense. So that's how I think the common law aspect of the duty question, and actually the whole case, begins. It's open and obvious, then how is that to be framed, then deliberate encounter, and is that question fact or law? Moving then to the last point is this 3-1-10 statute. And there are, it is a short statute. I will tell you I read, without getting into too much detail, that there are no exceptions for Wilf and Wanton to it. I think it is one of those absolute statutes. And that question then is those six enumerated exceptions for water not owned by municipality. And really the only cases seem to me to be Frame, Choice, and McCoy. And McCoy, and I think, obviously I think they're all distinguishable, but I will tell you why in this particular case. I think that the ways one can show one of these exceptions being triggered is, for instance, control is the one I believe applies in this particular case. And the Choice case was a supervision case. And the appellate court there found that supervision of activities on water doesn't trigger the immunity, the exception to the immunity. The Frame court discussed control. And it found that, what do you, the appellate court or the trial court, how does one address whether there is control or not? Well, I think there's two ways. One is by statute, not the Tort Immunity Act statute because it doesn't tell us anything about control. But are there other statutes? In the Park District, there's the enabling, not enabling, there's the statute regarding Park District property 70 ILCS 1205-11-4. And that one specifically states in the words of the statute that the Park District has control over waterways adjacent to its property for a distance of 300 feet. So I think the way one, I think the way we're supposed to look at these statutes is if they're using the same word, they're discussing the same things, they're discussing waterways, they're discussing the Park District, then that statute gave the Park District control over areas of water within 300 feet of its property, which is weird. So you're saying it shouldn't be limited to land? It includes water even though the Park District didn't own the water? Yes. Even though 300 feet? Yes. You're saying just that 300 feet? The 300 feet relative to the property. No matter who owns the property? Correct. The water. Right. Right. But in this instance, the property being water. Yes. Right. Because the 3-1-10 statute specifically says for water not owned by the municipality. Well, I'll take that back. If it's owned by them, well, then obviously we don't have to engage in the discussion. So I'm taking owned out of it. And then that's where all these other cases are where there's a municipality being called to be held to account for water it doesn't own. And then there's those six other supervisions. One, control is one. I forgot all the other ones. But what Frank was saying is what do we mean by control? One way of control is controlling access to the water, which I believe the Park District can do and I believe the city can do. Control access to the water at these locations. I also believe that, just point blank, the statute, the Park District statute about the 300 feet uses the word control for those 300 feet. So it seems to me that that's the control. And it's limited. I mean, the Park District's not going to be responsible for the entire Fox River. But the statute that gives the Park District this 300-foot control, which is where this incident occurred, seems to me that that's what they must be talking about with 3-1-10. But now, irrelevant of whether or not they had posted any signs, I mean, here by the Park District posting a sign or adopting an ordinance prohibiting swimming in the river, are you saying that they controlled the river in that spot? Or are you saying just by virtue of the fact that the place where this happened was 300 feet from? From the property they owned. Right. Both. It's enough. Both. Okay. And what I'm speaking to first, and what I'm speaking to first is does this immunity wipe out any liability? And the answer to the question is I think if there's any control, and that is either by statute or by the ability to control access, then the immunity doesn't apply. Now, what you've raised, though, with respect to the signage, goes to a second question. And that is then I have to litigate this case on a willful and wanton standard vis-a-vis the Park District as a municipal corporation. I think because the 3-1-10 doesn't immunize them if they have control over the water. And I think they do have control over the water by the ability to control access. And then the question is do they act willfully and wantonly in the way they caused or allowed access or not? And I can speak to some of those facts, which we really never talked about in the trial court, about what the Park District does to, I mean, they build stairs down here and a walkway to get to the water. And those are questions, though, that have nothing to do with duty. Those are questions that have to do with whether or not their conduct was negligent or not. And if it's just negligent, then I lose. If their conduct rose beyond the level of negligence to the level of willful and wanton, then I could win, depending on what the jury would say. But that's where I think the 3-1-10 question comes down. Some of those facts are going to, the ones that, I mean, ironically, the ones that help me prove duty by controlling access could absolutely hurt me on trying to prove that they acted willfully and wantonly. But for what we're doing, I think what we're talking about on this appeal is questions of law relative to the duty and the applicability of this immunity as opposed to am I going to win. I do believe I've pleaded enough to make a question of fact, but on willful and wanton. But that's, I don't know if that was really addressed at the trial court either. I know you can uphold it on any reason, even if the trial court didn't decide it. That's 15 minutes, right? We'll have additional time on rebuttal. Thank you. Mr. Dutton? Oh, she's going to start? I'm sorry. Okay. Let's do it. Okay. May it please the court. My name is Amanda Hillman, and I represent the city of Geneva in this matter. I will be addressing why the city is immune from liability under Section 3-110, while counsel for the Park District will be addressing the remaining defenses. Here, as the appellant mentioned, there's only one question before this court on whether the city is immune from liability under Section 3-110 of the Illinois Tort Immunity Act. The question is whether the city had control over the Fox River itself, the navigable waterway. Here, the city has no more control over that body of water than the city of Chicago has over Lake Michigan or than any city has over private property within its borders. Accordingly, this court should affirm the judgment of the circuit court below. As the record demonstrates, there's no question that the state of Illinois, subject to the power of the federal government, owns the Fox River, as Your Honor mentioned. The question here is control, and control by its plain and ordinary definition is the ability to direct the function of, the ability to alter the function of, the ability to cause something to function in a certain way. Appellant had two reasons why he believes that there's control over this case. If a statute grants control, or if the facts demonstrate that the municipal entity exercises control. Here, there's no statute that grants the city control over the Fox River. The city has no ability to alter the course of the Fox River. It doesn't have the ability to fill it if it needs to be more shallow, to dam it if it's too fast. In fact, if appellant's contention is the danger here is caused by the dam, the city has no ability to remove that dam from the river. The city has no ability to control that body of water. In fact, the Rivers, Lakes, and Streams Act specifies who has control and supervision over the Fox River. There, it describes that the Department of Natural Resources, an agency of the state, has both jurisdiction and supervision over the river. It goes on to describe that it is the power of the Department of Natural Resources to vigorously defend those bodies of waters to protect them from encroachment or wrongful seizure. And makes it unlawful for anyone, including the city of Geneva, to fill the river, to deposit any material, to construct any dam, or to do any work whatsoever within the body of water without approval from the Department of Natural Resources. Appellant's reliance upon frame versus decor is misguided. There, the court focused on the actual ability to deny physical access to the river. Here, the city can't do that. The city can't close off the river up or downstream, and it can't erect a fence or cord off the river as the court focused in frame. Additionally, Appellant's reliance upon the city's jurisdiction in his brief, which was not addressed today in argument, is also a red herring. Section 3-110, as Appellant mentioned, is plain and unambiguous. It is without limitation. It discusses ownership, control, supervision. Nowhere does it discuss jurisdiction. And as the Supreme Court has repeatedly reaffirmed, it's paramount that courts give the plain and ordinary meaning to the statute without reading into it conditions or limitations or exceptions that aren't there. But moreover, as this court is aware, jurisdiction over a place or persons is different from control. Jurisdiction is the ability to make legal pronouncements and administer justice. It is the ability for the city, through its police power, to make laws for the protection of its citizens. And it's why here, the city was able to say that swimming in this area is prohibited. But that doesn't give the city control over the location that those behaviors occur. In fact, the city makes a great number of laws like that. It prohibits theft on private property, trespassing on private property. And why did you say the city could do that? Through its police power, Your Honor. Through its power to have jurisdiction over areas within its municipal borders. So you think the police power then is very different than having control? It is, Your Honor. It is. If the city has police power, that's different than having control? It is. And it's the same thing that the court in Choice v. YMCA found, is that even if jurisdiction is considered control over behavior of persons, it's not control over the waterway itself. There, a very similar case, children drowned in the Fox River. The school district had the power to supervise them. It told them when they could and when they could not use the river. Nonetheless, the court made that distinction, that the ability to supervise the activities of those children is different from the supervision of the river itself. And for that reason, this court should affirm the judgment of the circuit court below. Thank you. Thank you. Mr. Dutton. Thank you, Your Honor. My name is Ed Dutton. I have the Park District. The reason we split the argument up this way, and I agree that Mr. Y's duty should go first and then immunity, is because that's the way we did it at the trial court, and the parties were comfortable with that, so we're going to do it that way. I'm going to touch first on the duty issue, and then I'm going to touch some on the immunity issues in the whopping ten minutes that I have. Thank you. Thank you, Your Honor. I had more difficulty preparing for this argument than most, and part of the reason is what I've called the novelty of Plaintiff's argument, because what the Plaintiff is saying is essentially this. He recognizes the existence of the open and obvious danger or open and obvious risk doctrine, but he says in his reply brief, the defendant shouldn't have the benefit of the open and obvious defense here because they don't own the place where the drowning occurred, and that strikes me as a really unique position for the Plaintiff to take. I agree with him that we have said all along, neither the Park District, the city, nor the county owns the river or owns the dam. That is given. Plaintiff acknowledges that. So what Plaintiff is essentially arguing is, we should not have the benefit of the open and obvious risk defense, which any landowner has, because we're an adjacent landowner. That's the problem with the Plaintiff's position in this case. It's not only directly contrary to settled law. At least two of the cases I've cited apply to the open and obvious risk doctrine where it was an adjoining property owner that was sued. One of those cases is Buccellaris. Chicago Park District is sued because they own the retaining wall next to Lake Michigan, but the injury occurs in Lake Michigan, and the Supreme Court affirms the application of the open and obvious risk doctrine to the Chicago Park District, even though the drowning occurred in the lake, which they don't own. This court did the same thing in the Torf case. Torf had two different defendants, Commonwealth Edison and the city of Waukegan, and this court had no problem whatsoever applying the open and obvious risk doctrine where the city only maintained the beach and, as the Plaintiff alleges here, encouraged users to recreate on the beach, and yet two drownings occur within Lake Michigan, the court applies the open and obvious risk doctrine. But aside from the case law, the other interesting problem with the Plaintiff's argument is this. If we take that to its logical extension, the property owner here, the state, that actually owns the property where this condition exists, which is the dam and the river going over the dam, the state would be able to enjoy the benefit of the open and obvious risk defense, but the adjoining property owner would not. That's the Plaintiff's position in this case, and that's why it was difficult to prepare for this argument. I've cited three different reasons why the public entity defendants have no duty in this case. The main reason is the open and obvious risk defense. There's a danger of drowning in water. Here, that danger is objective as a matter of law, and I've cited a dozen cases that no one disagrees with. Those cases hold that. The Plaintiff wants to argue that it should be subjective here. There's multiple problems with that. One, it's directly contrary to settled case law, and two, what the Plaintiff himself has pleaded, which the trial court focused on, is that the decedent, before he jumped into the water, and he voluntarily jumped in according to the allegations to complaint, before he jumped into the water, he actually observed a child, 12 years old, with the Plaintiff's terms, cycling viciously in the water in the boil below the dam. So it's not only open and obvious as a matter of law, but it was subjectively open and obvious to him. What could have made it more patent than him actually observing? I understand the Plaintiff alleges that's what motivated him to jump into the water, but he observed the very risk that he succumbed to, that of drowning in the boil below the dam. But are you saying that he did not know, or that he knew the effect of aerated water below the surface? To me, and I don't mean to sound harsh, we're never going to know that. Mr. Wise says that's a question of fact. How would we ever know if the decedent knew? But more importantly, from a legal standpoint, we don't need to know because that risk is objective. As this Court said in the Lerma case, the very reason bodies of water are dangerous is because of the attendant surface and subsurface natural and artificial conditions. That is what makes water dangerous. That's what makes the risk of drowning obvious to anyone old enough to be allowed at large. Therefore, whether Mr. Succi personally, subjectively, recognized all of the attendant risks with jumping in below the dam, it doesn't really matter because from an objective standpoint, which is what the law requires us to apply, it is an open and obvious risk that you can drown in a body of water. With regard to the deliberate and counter-exception, because the Plaintiff then jumps off and says, we should address that. And he takes criticism of the trial court for not addressing that. As I pointed out, one reason the trial court didn't is because it wasn't pleaded, but more importantly, it's because it has no application here. I've cited not only the case law, which in each instance, including the cases cited by the Plaintiff, the Plaintiff cites two on this point, Lefebvre v. Kenway, and Rush v. Madera, this Court's own decision. And in both of those cases, the deliberate and counter-exception to the open and obvious risk rule was applied where there was economic compulsion. And the jury instruction 120.09, which the Plaintiff says we should cite to when you read the committee comments, they quite correctly say economic compulsion is a factor to be considered when you are determining whether to apply the deliberate and counter-exception. What the Plaintiff would like to do is set that doctrine aside and say, anytime anyone decides to encounter a known risk, if you could come up with a reason why they might be compelled to do that out of, here, a personal desire to save a child from drowning in a river, then the adjacent property owner becomes liable for that person's decision. That's what the Plaintiff is seeking to do in this case, which is why it was difficult to prepare. The second reason I've pointed up for no duty is under the common law, and the Plaintiff doesn't address these cases, but under the common law, there is an entire body of case law. I've cited several. I'm going to focus on the Sweat cases I did in the brief. Sweat v. Village of Algonquin, and my point is this. In Sweat, you have the restaurant where it has the parking lot on the opposite side of the road, and the Plaintiff pleads, just like the Plaintiff does here, that there was a known danger on the roadway that of being struck by cars, and the restaurant encouraged and, in fact, had the equivalent of a practical easement. They had the parking lot on one side, and they encouraged patrons to cross the road and even park on the road, thereby increasing the risk. If you take state-owned roadway and replace that with state-owned Fox River and Dam, the Sweat case is directly on point and the same reasoning applies. The adjacent property owner hears the rule. In that case and all of the others, the adjacent property owner has no liability for conditions on property that it does not own or maintain. The entire basis for landowner liability is because the defendant property owner can do something to repair, warn of, or protect against the risk. But here, where the injury and the conditions are on property that we don't own, that we don't maintain, and that we don't control, it makes no sense. But yet, signs were put up. I mean, but even though you don't control it, so what was the purpose of the signs? The sign was just like any other property owner that says, if I have, let's make it a river, let's make it a cliff. If I have at the edge of my property a danger beyond my property, I think it's actually a good thing that I put a sign up that says, don't go beyond my property. Do not go in here because you may be injured. That's not what the purpose of the signs was. Here, also, that ties into my third no-duty argument, and that is 3102 of the Tory Utility Act. And the plaintiff says, well, wait a minute, how come the defendant's raising 3102 and the injury occurred in the river? And it's because the plaintiff's allegations and the complaint are that the park district configured its land in such a way as to invite people to recreate along the river, failed to put up fencing, and failed to have adequate signage. Those are all allegations regarding the condition of the park district's property, and for that reason, I have correctly raised 3102 of the Tory Utility Act, which lays out the specific pleading requirements for holding a public entity liable for a condition of its own land. And as I pointed out there, and I've cited a number of cases, the Bow case out of this court, which was my case, the Sisk case out of the Supreme Court, which involved the plaintiff stepping up onto the bridge abutment on the side of the road. The point is, if you're not intended to use your property, then there's no duty of whatsoever. And that's where we come back to the importance of the signage. If we have signs saying, don't go beyond here, and someone does, they're a non-intended user as a matter of law. Now, stepping aside from the duty issues, because I only have a couple of minutes left, on the 3110 issue, the plaintiff cites to all the defenses of race 3110. And the plaintiff cites, with regard to the park district, to a portion of the park district code, and that first sentence is this. I'm reading from section 11-4 of the park district code, and it says this. Subject to the provisions of section 1 of an act to define the powers of members of police forces established and maintained by park districts approved, blah, blah, blah. And then when we go actually to that statute, it starts off with park police powers whenever any park district establishes a police force under section 4-7 of the park district code. My point is, that is a conditional extension of authority. It says, the park district shall have the right to establish a police force. The plaintiff hasn't pleaded that we established a police force, number one. That would be the most critical point here. Number two, the plaintiff has not pleaded that the park police force ever patrolled, controlled, supervised the river, assuming one even existed. But then third and most importantly, as Ms. Hillman pointed out, and as we've pointed out in the briefs, the fact that we have the right to supervise, to make arrests on the river, doesn't give us the right to control the river itself. That is a completely different issue. It's not partial control under 3-1-10. It says, control the body of water. And there is no allegation here that we controlled the dam or the river. It's completely the opposite. Any other questions? Thank you very much, counsel. Thank you very much. Mr. Wise? While you're walking up here, I apologize, I'm neglected to indicate Justice Burkett is a member of this panel. His nameplate is there, but unfortunately could not be here today. He will participate in deliberation on this matter, and certainly will, of course, listen to the oral argument. Thank you. I pointed out something in my brief that I didn't want to raise here again today, and it's just the way some of the argument is being made by the Park District. I never said that you could not apply because the Park District doesn't own the water or the dam. I never said that. It's not in my brief, and I didn't say it up here. In fact, it does, it can apply, and I realize they don't own it, and I realize they don't own the dam or the water. It is something for you to address. It should be addressed in the way I believe that I described earlier with Ward, but I never said it doesn't apply. What I said was that 3-1-0-2 does not apply to the dam or the river, because the Park District and the city don't own the dam or the river. 3-1-0-2 is for property that they own, their property. That was the distinction I was making. I know, counsel knows, that was the distinction I was making, but I don't want the court to misunderstand if it heard what he said, that I'm claiming that the open and obvious doctrine doesn't apply. The 3-1-0-2 applies to the condition of the defendant's land, and it's a Wolfman-Watton standard, so those are all issues that I don't think can be disposed of on a 6-1-9 motion, because we don't know all of these signs that Mr. Dutton is talking about. Obviously, there isn't anything on the flip side, because they don't have any evidence other than their statutes that they're applying. So this is why we find ourselves, as I described earlier, in a 6-1-9 situation, which often can be decided if they're very clean issues on the pleadings, but sometimes there's facts that trigger the exception or trigger the statute, and nobody's going to get that information from us because it's not on the record yet. So that is where I was talking about 3-1-0-2 and open and obvious. Turning to the issue for a moment of when he said that all the law is clear in the state, it's a known risk of drowning, jumping in the water, he loses, then that Ward case can't make any sense by his analysis, because the kids in the water risk drowning. And everybody who drowns in the water would automatically lose, and that's not the situation. That's what the Ward case was describing, how the Jackson Supreme Court, because it was Lerma, the one that counsel cites, after that comes the Jackson Supreme Court, and after that comes Ward. And Ward says, if there's a suggestion out there that all water drownings are open and obvious as a matter of law, that's not the situation. And they go through this duty analysis, and they realize, the plaintiff lost in Jackson, but the fact is it's still done. So it isn't this automatic, every time somebody's in the water, they lose. There's open and obvious, and there's no duty. And the last part, with respect to the economic compulsion, it is an absolute misstatement of the law, and the jury instructions, and the comments, because the Solomay Supreme Court said, and they were talking about those cases, where it is an economic issue, where it is sometimes used as an explanation to say this is compulsion. One compulsion is economic. That's not the only one. The Supreme Court said, although we do not hold that the deliberative encounter exception is applicable only in the kind of situations involved in Lefevre and Wall's economic cases. So they're saying it's not the only kind, but they found it didn't apply in that case either. And that's fine, but that's still, again, that's not saying that it has to be the only kind of case. We contradict a couple of cases out there, but it will certainly be the first one to ever say that it is a condition preceding to the application of that doctrine. And the last one, Justice has asked if I pleaded that the hazards were unknown. I did. And the complaint as to all of the defendants, among other places, because the complaint has multiple accounts with similar pleading allegations, C-235 and C-234 where I pleaded that the children and adults did not know of the aforesaid dangers of low-head dams downstream. The city of Geneva did know it. Park District did know it. So I pleaded that. And then last, the first, the city's lawyer, talking about control, she redefined control. She talked about altering the course of streams, filling in soil or dirt, re-damming it. I realize the city can't do that, but that's not what control means because the word control is obviously not defined in the statute for reasons that escape us. The legislature elected only to have two or three sentences on it. But the frame court said, well, we're going to look at what do we mean by control? And so did choice. And they said not activities on the water, but access. If they can control access, that's control as the statute means. So whether they can dam it or alter the course of the river is immaterial. People allowed to be within 50 feet of the dam, so they have these controls. Park District sends people down to the water as opposed to other places where you'll see the edge has got railings and a wall up and people can't get in there. Here they come on down. Here's the stairs to the water where people are fishing and there's maps that they have with fish on them that we want people to come in and fish in the water. So they do control access. And if they didn't want access, they can close it off if they want access, which they do. They invite people to come down and use the water. And that's why these accidents happen and are going to continue to happen. Thank you. Thank you. At this time the court will take the matter under advisement and render a decision in due course. We stand in recess until our next hearing. Thank you very much.